

**Joseph James Roe**

**Registry No. 51394-039**

**Federal Correctional Institution - Elkton**

**P.O. Box 10**

**Lisbon, OH 44432**

Honorable Judith E. Levy

United States District Court

Federal Building

200 E. Liberty Street, Suite 300

Ann Arbor, MI 48104

RE: <u>Inmate Joseph James Roe, United States Marshal #51394-039, Case No. 5:2015-cr-20581</u>

   <u>Emergency Request for Compassionate Release</u>

26th April 2020

Dear Judge Levy;

      I am writing you because I am being subjected to cruel and unusual punishment and I am begging you to save my life. While I realize that the previous sentence may appear overly dramatic, I assure you that is not the case and as you read this letter, you will see that the facts, as well as federal judges and the United States Attorney General unequivocally support the fact that I have every reason to believe that I am in imminent danger and have a very real fear for my life. Therefore, I write this request for compassionate release, pursuant to 18 U.S.C. § 3582(c), 28 C.F.R. § 571.61, The Cares Act Section 12003(b)(2), and the recent directives of Attorney General William Barr to the Federal Bureau of Prisons ("BOP") in carrying out these provisions to combat the spread and effects of Covid-19. Specifically, on March 26, 2020, Attorney General Barr issued a directive ordering the Director of the Bureau of Prisons to "prioritiz[e] home confinement as appropriate in response to the COVID-19 pandemic . . . to protect the health and safety of BOP personnel and the people in our custody." Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, Att'y Gen. (Mar. 26, 2020).

      Given the severe outbreak of Covid-19 in the low-security facility, Elkton Federal Correctional Institution ("Elkton"), where I am currently serving a sentence for the non-violent crime of Selling, Distributing, or Dispensing a Controlled Substance, my preexisting conditions make me particularly vulnerable to catching and suffering from severe or fatal consequences of the virus which present

"extraordinary and compelling circumstances", - unforeseen at the time of my sentence - that necessitate my immediate release; transition to home confinement. Indeed, the outbreaks across the nation in the Bureau of Prison system have been held to constitute "extraordinary and compelling reasons" under § 3582 (c)(1)(A)(i) by numerous judges in recent weeks.

Recognizing my prior actions, and your understandable view of my actions, please allow me to state the following in regards to my personal growth, changed perspective, and lessons learned thus far throughout my incarceration. I have sat down and spent hours trying to come up with an excuse to give you, with the hope of mitigating my crime... but, I simply cannot make any excuses to you for what I have done; there is just no excuse to give... I was wrong and I had no business doing what I did. Reality is, I have made a great many mistakes in my life, Your Honor... mistakes that until you sentenced me, I thought were mine and mine alone to bare. In the years that I have been incarcerated, while I have sat here and dwelled on my life, the years passed by, I got older, and it hit me how badly I have failed as a father... because of all my poor decisions leaving me incarcerated resulted in my being an absent parent. I have spent so many years of my life with priorities that were simply out of sync with reality. I used to think that money was what mattered most in life and I based most of my decisions on my pursuit of money. Then I committed the drug crime that lead to you sentencing me, and after my arrest it hit me (sickened me) that I was such a poor parent, I had led my son down the path to the criminal justice system.... As I was struggling to come to terms with that and figure out how I could turn my life around and make amends for it, my daughter had her first child, a daughter of her own named Brynlee Marie Ann (born October 30th 2019 at 11:34 pm).

Turning 52 years old in prison, watching my son having to restart his life last year when he was released from custody, my daughter having a daughter of her own, and my mother getting older, COVID-19 has taught me that the true punishment of jails and prisons are the inability to be there for those that I love... the inability to help them through the difficult and scary times that the COVID-19 pandemic has caused, and the complete inability to simply be there for them and demonstrate my love for them. As embarrassing as it is to admit, I have spent a great deal of my life with no purpose or mission other than money.... Today, a little older and a little more mature, all I care about is my elderly mother, (who lives alone and is at an extremely high risk for COVID-19), my children and my little granddaughter. I sat down to think about what I wanted to express to you in this letter... and if there is one thing that I would hope that you can feel in what I write, it is that I would do anything within my power to be there to take care of them, to help them during the devastation that the Coronavirus pandemic is causing in the world.

In support of my request for compassionate release to home confinement, I respectfully ask that you consider the following, in addition to the fact that I have been housed at F.C.I. Elkton:

1.) I am 52 years old, which increases my risk for being infected with COVID-19.

2.) I have kidney problems, and as such, a weakened immune system, making it much easier for infections (such as COVID-19) to take place, (as documented by the National Kidney Foundation).

3.) I have high blood pressure/heart disease.

4.) I am significantly overweight.

5.) I am incarcerated for a non-violent offense.

6.) I am not a threat to the community.

7.) I have served half of my sentence.

8.) I have a job waiting for me, at: Jim's Towing in Monroe, Michigan. This can be verified through April at Jim's Towing, 734.241.4500

9.) I have income from rental units, being managed for me by a friend, which would allow me to be self-sufficient.

10.) I have a place to live, with both/either:

a.) a lifelong friend; Debra Treadway, at: 4292 Clegg Road, in Lambertville, MI 48144

b.) my mother; Jane Roberts, at: 1698 Hemlock, in Monroe, MI 48162

11.) I have strong ties to the community; four kids, and a new granddaughter, Brynlee Marie Ann, who was just born on October 30th of 2019.

12.) During the years that I have been incarcerated I have done everything that I can possibly do to better myself and grow as a person so that I can become a more rounded person and a productive member of society upon my release:

a.) I have completed a substance abuse class.

b.) I work in the unit as an orderly; I have always accepted and done any job that has been assigned to me.

c.) I have stayed out of trouble since my incarceration and have not had a "ticket" since 2015.

d.) I am currently taking a landscaping class and a leather working class. I have completed several other classes in the years that I have been incarcerated.

As I write this letter on the 26th of April 2020, there are 799 federal inmates and 319 BOP staff who have confirmed positive test results for COVID-19 nationwide. The situation at Elkton is of the worst at all of the BOP facilities. There have been 27 federal inmate deaths attributed to COVID-19 disease. More specifically, Elkton has a <u>minimum</u> of 51 confirmed inmates and 48 staff members that have tested positive, with the COVID-19 virus... and 6 inmates that have died. In fact, the situation at Elkton is so grave that Ohio Governor Mike DeWine authorized sending 26 medically trained members of the Ohio National Guard to assist inside the institution. It should be noted that it is reasonably believed (even expected) that the numbers at Elkton are in fact, much higher than what is officially disclosed, because there has been very little testing done within Elkton, which obviously casts doubts on the published numbers. This is confirmed by the emergency Writ for Habeas pending in United States District Court - Northern District of Ohio, before Judge James S. Gwin, captioned; Craig Wilson, et al v Mark Williams, et al, U.S.D.C. – <u>Northern District of Ohio Case No.: 4:20-cv-00794</u>, in which Judge Gwin states: *"With the shockingly limited available testing and the inability to distance inmates, COVID-19 is going to continue to spread, not only among the inmate population, but also among the staff."* It should be noted that Judge Gwin went on to state that the BOP's publicized figures do not actually represent the real number of infections in its prisons, particularly Elkton. Of the 2,400 inmates in the prison, Elkton has received only 50 COVID-19 swab tests, and one Abbott Rapid testing machine with 25 rapid tests ... most of the swab tests have been used

.... tests are back-ordered and will arrive in July or August. In comparison, nearby Marion Correctional Institution run by the Ohio Department of Rehabilitation and Corrections, they tested their 2,500 inmates, (about the same number incarcerated at Elkton), and 1,950 of them tested positive.

In reference to the civil action before United States District Court Judge James S. Gwin, I refer you to a Forbes Magazine article, titled: "Federal Judge In Ohio Says FCI Elkton Meets "Cruel And Unusual Punishment" Standard" which can be found at:

https://www.forbes.com/sites/walterpavlo/2020/04/23/federal-judge-in-ohio-says-fci-elkton-meets-cruel-and-unusual-punishment-standard/#3b64111820d4

Which states: "Judge Gwin ruled that the spreading of the virus is a serious medical need and the the BOP has acted with "deliberate indifference. While the BOP has taken steps to reduce the contagion of the disease, Judge Gwin said, "one only need look at Elkton's testing debacle for one example of this deliberate indifference."

After speaking to "the officials at the Federal Bureau of Prisons, the Department of Justice, Governor DeWine and his team, the warden at Elkton, the Ohio National Guard and local hospitals treating patients from the facility," Ohio Congressman Bill Johnson called the facility "a petri dish, a breeding ground for the virus." According to the Ohio Newspaper, the *Cleveland Scene*, as of April 7th 2020, 71 inmates were in isolation with symptoms, 37 inmates had been transferred to an outside hospital with the virus or similar symptoms, 12 of those being placed on ventilators. Further, inmates at Elkton have expressed in the media that the situation is, in fact much worse than these figures, and a video taken by one inmate, while unofficial and unconfirmed, has been circulating displaying and discussing the poor conditions at Elkton. Though I obviously have no way to confirm it, rumors at the facility are that both the facility's Warden and Assistant Warden are in the hospital. My housing unit does not currently have a case manager nor counselor and that I am confined to a large room with 140 inmates, over 30 of these inmates have gotten sick and have been removed from the Unit, the staff has been quoted as saying, "[inmates] would have better luck playing Russian roulette [than being in Elkton]." The prison staff who run the commissary stopped showing up to work, leaving inmates unable to buy hygiene products, including soap. Families of inmates and staff are picketing outside of the facility. I emphasize that the situation has gotten so desperate, and the local hospitals so overwhelmed with inmates, that The National Guard has had to come in and build a makeshift hospital within the facility. See: "Ohio National Guard arrives to help sick Elkton inmates", WKBN 27 Frist News, (Apr. 8, 2020), https://www.wkbn.com/news/coronavirus/ohio-national-guard-arrives-to-help-sick-elkton-inmates/

As you are likely aware, Attorney General William Barr has directed federal prison authorities to begin identifying more inmates for home confinement to avoid a larger outbreak of the coronavirus inside the agency's 122 institutions. At the time of his initial directive, March 26th, 2018, only 6 inmates and four staffers had contracted Covid-19 in the entire BOP system, but since then that number has grown exponentially to 352 inmates and 189 BOP staffers. Attorney General Barr has stated that "there are some at-risk inmates who are non-violent and pose a minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." Id. Further, Attorney General Barr has individually and specifically listed FCI Elkton as one of three BOP facilities to give priority to under his directives due to their especially poor conditions. Due to the severity of the condition at Elkton particularly, I request, that I be provided an attorney for the purpose of a telephonic hearing seeking

compassionate release. I have pre-existing conditions that make contracting Covid-19 easier, and which greatly increase my potential to suffer severe health issues and death if I do so, including being considerably overweight, having heart disease and problems with my kidneys. The CDC has specifically emphasized the increased risk of contracting and suffering more severe consequences of Covid-19 in those who have heart problems.

Research shows that prisoners and jail inmates are more likely than the general population to report experiencing infectious diseases, indicating that these individuals face a heightened risk during this pandemic.1 Laura M. Maruschak et al., Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12, U.S. Department of Justice, Bureau of Justice Statistics, (2016), https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

Your Honor, a quick Google search will confirm that the issues that I am raising in regards to Elkton are not contrieved, and I ask that Your Honor note:

   a.) "Prisoner Uses Smuggled Cellphone to Beg for Help With Coronavirus on Facebook Live", Vice News, (Apr. 5, 2020), https://www.vice.com/en_us/article/z3b9qj/prisoner-uses-smuggled-cellphone-to-begfor-help-with-coronavirus-on-facebook-live 5 Carolyn Sistrand,
   b.) "Peaceful protests held near Elkton as concern for inmates grows", WKBN 27 First News, (Apr. 11, 2020), https://www.wkbn.com/news/coronavirus/peaceful-protests-held-near-elkton-as-concern-for-inmatesgrows/. 6 Gerry Ricciutti,

Prior to the enactment of the First Step Act, only the Bureau of Prisons could bring a motion for compassionate release on behalf of an inmate; an inmate could not bring such a motion before a court on his own. Various district courts ruled that the prior version of the compassionate release statute required, as a jurisdictional matter, that any such motion is brought by the Bureau of Prisons. See, e.g., Morales v. United States, 353 F.Supp.2d 204, 405 (D. Mass. 2005); United States v. Sumner, 201 F.Supp.3d 21, 22-23 (D. D.C. 2016). Following the passage of the First Step Act, the "exceptions" allowing the court to revisit a sentence, to which the courts in both Morales and Sumner referred, were expanded. According to 18 U.S.C. § 3582 (c)(1)(A), the statute allows a defendant to bring a compassionate release motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendants behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Based on reasonable statutory interpretation, the law clearly indicates that a defendant's failure to request that the Bureau of Prisons file a motion at all is a jurisdictional flaw, but that a failure to complete the statute's 30-day waiting period is not. Cases such as Morales and Sumner make abundantly clear that, under the earlier version of § 3582, defendants had no right to bring a compassionate release motion, and courts had no jurisdiction to hear such motions. Under the current version, the law maintains a preference – but not an absolute requirement – that the Bureau of Prisons and not individual defendants file the compassionate release motions. To the extent that Morales and Sumner speak to the current requirements of § 3582, they suggest that failure to request a compassionate release motion from the Bureau of Prisons before filing one with the court would be a jurisdictional defect and be fatal to the motion. Where the earlier version of the statute barred defendants from filing such motions on their own, the current version prohibits defendants from doing so without first requesting the Bureau of Prisons. This statute does not, however, extend to the waiting period described by the statute. First, the text of the statute provides two pathways

by which a defendant may ordinarily file a motion for compassionate release: either by exhausting an administrative right to appeal the Bureau of Prisons failure to file such a motion or by waiting 30 days after requesting they do so. 18 U.S.C. § 3582 (c)(1)(A)(ii). The statute further specifies "whichever is earlier" among these two potential dates is the date on which the defendant is ordinarily allowed to file. Id. In doing so, Congress ensured that neither exhaustion of remedies nor a 30-day waiting period is per se required. Congress further manifested an intent that, generally speaking, a defendant be able to file a compassionate release motion expeditiously. Accordingly, the waiting period and exhaustion of remedies clauses are best understood as a "claims-processing rule" that can be set aside by the court, at least in cases of a dire emergency. Several federal appellate courts, in interpreting a different position of 18 U.S.C. § 3582 (c) have held that the language of that subsection is non-jurisdictional. United States v. Taylor, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter generally dealing with sentences of imprisonment... .[n]or is subsection (c) phrased in jurisdictional terms."); see also United States v. Calton, 900 F.3d 706, 711 (5th Cir. 2018) (citing United States v. Carabello-Martinez, 866 F.3d 1233, 1243 (11th Cir. 2017); United States v. May, 855 F3.d 271, 274 (4th Cir. 2017); United States v Anderson, 772 F.3d 662, 667 (11th Cir. 2014); United States v. Beard, 745 F.3d 288, 291 (7th Cir. 2014); United States v. Trujillo, 713 F.3d 1003, 1005 (9th Cir. 2013); United States v. Weatherspoon, 696 F.3d 416, 421 (3rd Cir. 2012); see also United States v Green, 886 F.3d 1300, 1306 (10th Cir 2018). Accordingly, subsection (c) generally should not be understood to impose jurisdictional requirements. While prior holdings governing compassionate release under earlier versions may create an ongoing requirement that defendants request that the Bureau of Prisons file compassionate release motions before filing their own, the waiting period prescribed by the statute cannot be understood as a jurisdictional requirement. While I made a petition to the Warden of Elkton for compassionate release, weeks ago, the Warden stated that compassionate release/reduction in sentence under Title 18 U.S.C. 3582 (C) (1) allows a sentencing court to order the compassionate release, and stated my request is denied as ***"there are no extraordinary or compelling reasons."*** which is clearly arbitrary and capricious in light of the COVID-19 pandemic, United States Attorney General William Barr's directive to the Bureau of Prisons, numerous judges in the past few weeks, and the current case referenced above; Northern District of Ohio Case No.: 4:20-cv-00794.

I have not been able to follow up on obtaining written documentation that I have exhausted those remedies; as despite normal Bureau of Prisons policy and procedure that make staff members' accessible to the inmate population in weekly "walk-throughs" because, as stated, it is believed that the Warden and the Assistant Warden are currently in the hospital. In any event, "exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic." As recently held by the Honorable Judge Analisa Torres on April, 1st, 2020, in her opinion granting the Compassionate Release of Wilson Perez. United States v. Perez, No. 17 Cr. 513 (AT), Dkt. 98 at 2, 6–7. In the past two weeks, numerous courts, including this one, (See, United States vs Keith Kenedy, Case 5:18-cr-20315-JEL-EAS ECF No. 77 filed 03/27/20), have ordered the temporary release from custody of inmates held in pretrial or presentencing custody. See, e.g., United States v. Chandler, No. 19 Cr. 867 (PAC), 2020 WL 1528120, at *1–3 (S.D.N.Y. Mar. 31, 2020) (granting bail application, pursuant to 18 U.S.C. § 3142(i), of the defendant charged with being a felon in possession of a firearm); United States v. McKenzie, No. 18 Cr. 834 (PAE), 2020 WL 1503669, at *2–3 (S.D.N.Y. Mar. 30, 2020) (granting bond pending sentencing, pursuant to 18 U.S.C. § 3145(c), to the defendant who had pleaded guilty to a single count of assault with a deadly weapon and had previously been released on bond); United States v. Hernandez, No. 19 Cr. 169 (VM), 2020 WL 1503106, at *1 (S.D.N.Y. Mar. 30, 2020) (granting bail

application, pursuant to § 3142(i), of a 64-year-old defendant with asthma and high blood pressure that placed him "at a substantially heightened risk of dangerous complications should he contract COVID-19"); United States v. Witter, No. 19 Cr. 568 (SHS), Dkt. 40 at 2–3 (S.D.N.Y. Mar. 26, 2020) (granting bond pending sentencing, pursuant to § 3145(c), to a defendant who had pleaded to a narcotics offense); United States v. Perez, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (granting bail application, pursuant to § 3142(i), of 65-year-old defendant with COPD, in light of "unique confluence of serious health issues and other risk factors facing this defendant, . . . Which place him at a substantially heightened risk of dangerous complications should [he] contract Covid-19"); cf. United States v. Stephens, --- F. Supp. 3d ---, No. 15 Cr. 95, 2020 WL 1295155 (AJN), at *3 (S.D.N.Y. Mar. 19, 2020) (granting defendant's request for reconsideration of bail conditions and releasing him to home confinement, while noting that, in the alternative, § 3142(i) would necessitate his temporary release). And while the requirement of administrative exhaustion appears thus far to have limited the number of cases in which defendants serving their sentences have obtained compassionate relief from a court under § 3582(c)(1)(A)(i), at least two courts, finding administrative exhaustion, have resolved such a claim and granted such relief. See United States v. Muniz, No. 4:09-Cr-0199-1, 2020 WL 1540325 (KPE), at *1–2 (S.D. Tex. Mar. 30, 2020) (finding extraordinary and compelling reasons under § 3582(c)(1)(A)(i) in light of the heightened risk to inmate presented by Covid19); United States v. Campagna, No. 16 Cr. 78-01, 2020 WL 1489829 (LGS), at *3 (S.D.N.Y. Mar. 27, 2020) (same); cf. United States v. Perez, No. 17 Cr. 513 (AT), Dkt. 98 at 2, 6–7 (finding extraordinary and compelling reasons under § 3582(c)(1)(A) and waiving the requirement of exhaustion of administrative remedies). Further, the U.S. Attorney's office for the Southern District of New York office has stated that it does not oppose similar compassionate releases due to vulnerability to Covid-19. Specifically, regarding the unopposed compassionate release of Daniel Hernandez, a 23-year-old former gang member who pleaded guilty to an array of charges including weapons possession, armed robbery and dealing fentanyl and heroin, Nicholas Biase, spokesman for the U.S Attorney's Office for the Southern District of New York said, "The government did not oppose counsel's motion for compassionate release because the defendant's medical condition placed him at high risk during the coronavirus outbreak."

Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees. These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing). Id. The CDC recommended that all correctional facilities take preventative measures, including: ensuring an adequate supply hygiene and medical supplies, allowing for alcohol-based sanitizer throughout facilities, providing no-cost soap to all inmates for frequent handwashing, cleaning and disinfecting frequently touched surfaces several times per day, performing pre-intake screening and temperature checks for all new entrants, increasing space between all detained persons to at least six feet, staggering meals, and having healthcare staff perform regular rounds. Id. Even if all of the CDC's interim recommendations are followed, and this record suggests that they are not, the Court is concerned that such measures will prove insufficient to stem deadly outbreaks. See, e.g., New York City Board of Correction Calls for City to Begin Releasing People From Jail as Part of Public Health Response to COVID-19, N.Y.C. Bd. of Corr. (Mar. 17, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/News/2020.03.17%20-%20Board%20of%20Correction%20Statement%20re%20Release.pdf (arguing that, despite the "heroic work" of Department of Correction and Correctional Health Services staff "to prevent the transmission of

COVID-19 in the jails and maintain safe and humane operations, the City must drastically reduce the number of people in jail right now and limit new admissions to exceptional circumstances").

I am an ideal candidate for compassionate release, Your Honor. I am a non-violent offender, having pleaded guilty to Selling, Distributing, or Dispensing a Controlled Substance. I have no pending charges, no history of violence, and no gang affiliations. I am currently at the low-security facility, which is significant as CARES ACT priority is given to inmates residing in low or minimum-security facilities. [14] I am housed in one of the very institutions that led to United States Attorney General William Barr directing the Bureau of Prisons to increase the use of home confinement and expedite release of inmates. Upon arriving at Elkton, I was told that I am an ideal candidate for home confinement via the RDAP program, which takes one year off of the sentence, and provides an additional 1 year of home confinement if I was to stay out of trouble and complete programming here at the prison, (as stated above, I have done exactly that). Therefore, allowing me to carry out my sentence in home confinement now, due to Covid-19, would not be a significant alteration of my sentencing, nor would it be out of line with what the Bureau of Prisons already indicated was to eventually happen.

Relevant to the analysis under Attorney General Barr's guidelines is that I have explained my home-confinement plan should he be granted compassionate release. I have very supportive family friends that will ensure that my basic needs are met and taken care of. I also have a specific place to go to carry out my sentence. If granted the opportunity for home confinement, I will live with either: a.) a lifelong friend; Debra Treadway, at: 4292 Clegg Road, in Lambertville, MI 48144, or alternatively; b.) my mother; Jane Roberts, at: 1698 Hemlock, in Monroe, MI. Either residence is large enough to support the court-ordered social distancing as well as quarantine requirements that are impossible to comply with at Elkton. I will have access to recommended safety equipment, including masks, hand sanitizer, as well as other CDC recommended cleaning and protection measures that I do not have access to while incarcerated. In addition, I am not a risk to the community nor a threat to public safety. The crime to which I plead guilty for was the non-violent drug related crime of Selling, Distributing, or Dispensing a Controlled Substance. However, I am a very low risk of recidivism for such crime; as I have a supportive family that will be providing for my basic needs. Further, I have independent earning potential through rental property and a family friend that is willing to teach me to sell items on eBay and Amazon, which can all be completed from within home detention. Naturally I am aware that I will need to obtain permission from the Government and this court and be in compliance with all Restitution requirements and pay all existing fines. Being able to work on these projects while in home confinement will allow me to not only supply for my own basic needs but also begin paying restitution through legitimate means and provide value to society, while being closely monitored. This is again significant as CARES ACT priority is given to those that have a verifiable re-entry plan that will prevent recidivism and maximize public safety, including the fact that being home would present a lower risk of contracting Covid-19 than remaining in prison.

I was sentenced to 144 months' imprisonment plus three years Supervised Release. I have been incarcerated since September 3rd 2015; which puts me well over the 25% of my sentence that has been set as the minimum percent of sentence served, and in fact, with "good time" credits I have served 50% of my sentence. Your Honor, it is not my intent to attempt to avoid my sentence, but simply avoid potentially life-threatening consequences from Covid-19. In conjunction with this request I am requesting that I serve the remainder of my sentence on Home Detention, and I would be willing to stipulate to increasing the Supervised Release time, post Home Detention, from 3 years to 5 years. For the duration

of Home Detention and Supervised Release, I will pay a percentage of all income to the Court for restitution and fines as required. Further, I am aware that additional requirements, conditions, and supervision are entirely under the jurisdiction and power of the Court, and that this motion provides a list of proposed additional conditions to demonstrate my willingness to put the interest of the people I hurt first ahead of my own, to provide recovery, and to show my understanding and awareness of the fact that any wronging or noncompliance would result in severe punishment and additional prison time. In summary, I meet valid, genuine, and urgent conditions under Attorney General Barr's memorandum and state of emergency declaration as well as the CARES ACT for priority consideration of compassionate release. My kidney and heart problems, underlying conditions are incredibly dangerous CDC-recognized conditions that put me at great health risk should I contract Covid-19 in the close-confines of institutional incarceration. I have gotten both the support of family and a plan for home confinement that is appropriate for my circumstances, where I would be able to continue to work on my restitution. Finally, if granted the opportunity for home confinement, I plan to serve my safely and without the additional risk, stress, and fear associated with Covid-19 and this world-changing global pandemic. My worst and I think you will agree, understandable fear, is that a denial of this request will inevitably lead to infection by the Coronavirus and due to my health, result in my death.

Your Honor, I am not an attorney, I have no form legal training, and in fact don't have much in the way of a formal education (I have had to resort to having a friend assist me write this letter), and I am stuck in, not just a prison, which Your Honor has acknowledged in previous and unrelated cases are at significantly increased risk for COVID-19, but a prison that is notoriously one of the most fertile breeding grounds for COVID-19 in the entire country. While I acknowledge that it is unquestionably my poor decisions that put me here, I submit to you that prior to my sentencing you evaluated all the facts and you sentenced me to a term of incarceration… you did **not** sentence me to the death penalty, and that is what I face every day I am incarcerated in a petri-dish of COVID-19, Your Honor.

Gregg Gonsalves, an assistant professor of epidemiology at Yale University, has been quoted in the media as saying: "The bottom line is that it's nearly impossible to do infection control in prisons." Going on to say that, the best option is to reduce the prison population, and other epidemiologists agree. "We know from studies of TB, HIV and hepatitis C that infections spread rapidly in prisons, and when they do, they often end up on the outside of prisons," Gonsalves said. "Viruses and bacteria don't respect prison walls." COVID-19 can live on hard surfaces for several days. In the close quarters of prisons, it is impossible to stay 6 feet away from others, which is what people on the outside have been instructed to do to slow the spread. Failure to reduce prison populations quickly, experts say, threatens the health of not only inmates but also of prison employees and the public. Sick prisoners infect employees, many of whom live in small towns surrounding the prisons. Then, an illness can spread through the community, overwhelming hospitals. It only takes one person to infect an entire facility (including both incarcerated people and staff) with this dangerous and highly infectious virus. Staff have to go home at the end of their shift and come back to work the next day. Deliveries of food and other supplies have to continue, and these staff and other individuals live in communities where community spread of COVID-19 is occurring.

Overcrowded prisons are a ticking time bomb that threatens the health of all Americans. The call for action to release prisoners as a result of the pandemic is echoing around the country. In light of the threat to society as a whole, COVID-19 necessitates informed, speedy, and preemptive action to reduce the risk of infection, illness, and death to prisoners and prison officials alike. See Xochihua-Jaimes v. Barr, No. 18-71460, ECF No. 53 (9th Cir. Mar. 23, 2020) (sua sponte ordering release of non-citizen from

immigration detention center "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers."); United States v. Perez, No. 19-cr-00297, ECF No. 62 (S.D.N.Y. Mar. 19, 2020) (finding that the defendant's heightened risk to COVID-19 complications constitutes a compelling reason for release under § 3142(i)); United States v. Barkman, No. 19-cr-0052, 2020 U.S. Dist. LEXIS 45628, at *11 (D. Nev. Mar. 17, 2020) (granting emergency relief amending probation order to delay confinement for thirty days because of risk of infection to both Defendant and others in jail).Therefore, I plead with you to do the right thing, find that I would not pose a danger to the safety of any other person or to the community and grant me a compassionate release, allowing me to serve my sentence on home detention.

In closing, I respectfully request that if this writing of mine is not sufficient for you to grant me a compassionate release to home detention pursuant to 18 U.S.C. § 3582(c), 28 C.F.R. § 571.61, the Cares Act Section 12003(b)(2), and the recent directives of Attorney General William Barr to the Federal Bureau of Prisons ("BOP") in carrying out these provisions to combat the spread and effects of Covid-19, that Your Honor appoint me an attorney and direct the attorney to immediately file appropriate pleadings with this court to address this cruel and unusual punishment that is placing me in imminent danger of severe illness and death. Regardless of your consideration of my plea for compassionate release, I'd like you to know the impact this situation has had on me. My thoughts immediately after sentencing couldn't have been further from reality. It took me longer than it should've, but your message has come through. It'll be a long road, but I can finally report, everything feels right. I'm living with a level of peace and acceptance that I lost in the events leading up to my arrest. I'm working harder than ever, in furtherance of a mission I truly know is right.; to improve myself, and hopefully make it home to be there for my elderly mother, children and young granddaughter. I know that by living every day with the dedication of getting to the point that I can help those I let down, and by doing it within the laws of society, I will slowly but surely make my way down the path to building a good life and being a positive influence on my children, granddaughter and society in general.

Thank you for your Honors consideration of his request.

Respectfully submitted this 26th day of April 2020:

Joseph Roe

Registry No. 51394-039

Federal Correctional Institution - Elkton

P.O. Box 10

Lisbon, OH 44432

## CERTIFICATE OF SERVICE

This letter is not ex parte communication: I, hereby swear state and certify that a copy of the foregoing Emergency Request for Compassionate Release was placed in an envelope with sufficient First Class postage and mailed to:

>United States Attorney's Office
>
>ATTN: Mr. Matthew Schneider, U.S. Attorney
>
>211 W. Fort Street, Suite 2001
>
>Detroit, MI 48226

Said mailing occurred on the 26th day of April 2020.

Joseph Roe

**Joseph James Roe**

**Registry No. 51394-039**

**Federal Correctional Institution - Elkton**

**P.O. Box 10**

**Lisbon, OH  44432**

Office of the Clerk of the Court

United States District Court

Federal Building

200 E. Liberty Street, Suite 300

Ann Arbor, MI 48104

RE: Document for filing in Case No. 5:2015-cr-20581, USA vs Roe

26th April 2020

Dear Clerk;

I am writing to ask that you file me enclosed letter to the Honorable Judith E. Levy that is enclosed under cover of this letter, which is captioned:

Inmate Joseph James Roe, United States Marshal #51394-039, Case No. 5:2015-cr-20581

Emergency Request for Compassionate Release

Thank you for your time and attention in this matter.

Have a good day & be well.

Sincerely,


Joseph Roe

U.S. POSTAGE PAID
FCM LG ENV
ALGONAC, MI
48001
APR 27, 20
AMOUNT
$1.40
R2305K137834-12

United States District Court
ATTN: Clerk's Office
Theodore Levin U.S. Courthouse
231 W. Lafayette Blvd., Room 599
Detroit, MI 48226

U.S. MARSHALS

RECEIVED
MAY 06 2020
CLERK'S OFFICE
U.S. DISTRICT COURT

Joseph James Rice
Registry No. 51394-039
Federal Correctional Institution - Elkton
P.O. Box 10
Lisbon, OH 44432