UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,              CRIMINAL NO. 15-CR-20581

vs.                         HONORABLE JUDITH LEVY

D-1 JOSEPH JAMES ROE,

              Defendant.

**United States' Response Opposing
the Defendant's Motion for Compassionate Release**

Defendant Joseph James Roe was the leader of a Drug Trafficking Organization (DTO) based in Monroe, Michigan and was a large-scale distributor of opioids, to include oxycodone hydrochloride HCL, oxycodone/APAP, and hydromorphone in Michigan and Tennessee.

Roe has a vast and extensive criminal history, which dates back to 1985. The Defendant has convictions for assault and battery, larceny, concealing and receiving stolen property, operating a chop shop, maintaining a drug house, retail fraud, and delivery of controlled substances.

1

Roe began serving his current sentence on September 27, 2018. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied

Roe does not qualify because Roe does not satisfy the statutorily mandated criteria for compassionate release. (See Exhibit A - Warden's Denial Letter). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Roe's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Roe's age and medical conditions do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Roe is only 52 years old and he is not suffering from a serious physical or medical condition, nor cognitive impairment.

His offense and criminal history also make him a danger to the community, *see* USSG § 1B1.13(2), because he was the leader of large scale DTO, and has an extensive criminal history fraught with convictions for  violent offenses.  And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release because he is statutorily ineligible for compassionate release.

## Background

Joseph Roe has been in and out of prison for the last 30 years. (PSR ¶¶ 41–54). Since the age of 17, Roe has served time for larceny, possessing stolen property, operating a chop shop, selling cocaine and heroin, and maintaining a drug house. (*Id.*). In March 2012, shortly after he had been paroled for illegally possessing cocaine, oxycodone and heroin, Roe learned about a doctor named Mark Buzzard who supposedly operated a drug treatment clinic, but who actually would prescribe anything a patient wanted. (PSR ¶¶ 14–17; R. 318: Sent. Tr., 2525–26). In other words, Dr. Buzzard operated a pill mill.

Roe identified "patients" to be seen by Dr. Buzzard for the sole purpose of obtaining oxycodone and hydromorphone prescriptions, that once filled, Roe distributed the pills primarily in Tennessee.   (PSR ¶ 15). Roe ensured the patients met with Dr. Buzzard and received the controlled substances: he provided cash to pay for the doctor visit and prescription; he supplied transportation so they could get to the doctor's office; and he gave them urine samples so they could trick Dr. Buzzard's staff into thinking they had used the drugs previously prescribed. (*Id.* ¶

17; R. 318: Sent. Tr., 2526–43). Roe paid the so-called patients in money or drugs for the pills that they got from Dr. Buzzard. (PSR ¶ 17).

Roe used couriers to take the pills to locations where street prices were higher than in Michigan. (PSR ¶ 15; R. 318: Sent. Tr., 2556–57). Primarily, Roe sent the drugs—200 to 600 pills at a time—to Tennessee where oxycodone sold at prices two to three times that in Michigan. (R. 318: Sent. Tr., 2556–58). The couriers brought the drug proceeds back to Roe, and he used the money to invest in rental homes and classic cars. (R. 319: Sent. Tr., 2619–20, 2656).

The scheme fell apart after a pharmacist in Monroe, Michigan,[1] noticed Dr. Buzzard had prescribed an excessive amount of controlled substances and contacted the DEA. (PSR ¶ 13). Agents observed several of Dr. Buzzard's patients go to his office to obtain prescriptions, fill the prescriptions at pharmacies, and then deliver the pills to Roe at his house or job. (*Id.* ¶ 16). Agents also obtained a wiretap for two of Roe's phones and intercepted calls related to coordinating patient visits to Dr. Buzzard, taking pills to Tennessee to distribute, and the price that his

---

[1] Monroe, Michigan, where Roe lived, is over 40 miles from Dr. Buzzard's office.

dealers would charge per pill as well as the expected profit. (R. 1: Complaint, 31–52).

A grand jury indicted Roe with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, eighteen counts of distributing a controlled substance, and one count of possession with intent to distribute a controlled substance, both in violation of 21 U.S.C. § 841(a)(1). (R. 50: Superseding Indictment, 160). He pleaded guilty to the conspiracy charge without a written plea agreement, and the government agreed to dismiss the other charges. (R. 262: Plea Hr'g, 1757–80). The probation department calculated Roe's guideline range as 235–240 months in prison based on an estimated 119,381 pills distributed by the conspiracy, with a marijuana equivalency of 7,639 kilograms. (PSR ¶¶ 24, 89). This drug quantity resulted in a base offense level of 32. (*Id.* ¶ 30). It also recommended a four-level increase based on Roe's role as a leader or organizer of the criminal activity. (*Id.* ¶ 32).

Roe objected to the drug quantity and the role-in-the-offense enhancement. The parties later agreed to reduce the drug quantity attributable to Roe to 19,872 oxycodone pills, but despite the significant

5

reduction in the number of pills, the marijuana equivalency of 3,991 kilograms still placed him in offense level 32. (R. 318: Sent. Tr., 2544). Roe still objected to the role-in-the-offense enhancement and argued that he should have received three points under USSG § 3B1.1(b), not four points as a leader or organizer under § 3B1.1(a). (*Id.* at 2530). Roe pointed to Dr. Buzzard as the true "leader" of the conspiracy because it could not function without him providing prescriptions to obtain oxycodone and there was no evidence linking Roe directly to Dr. Buzzard. (*Id.* at 2526–31).

This Court rejected Roe's argument that he was not a leader because it ignored the full scope of the conspiracy and Roe's role as "the central figure" organizing the patients, pills, transportation, and sales. (*Id.* at 2532). This Court also observed that Roe claimed a larger share of the fruits of the crime than Dr. Buzzard. (*Id.* at 2531). Thus, this Court found that while the conspiracy could not function without a corrupt doctor, Roe supervised multiple members in a "large scale opioid pill mill" that spanned multiple states and denied the objection. (*Id.* at 2531–33).

As a result, Roe's guidelines range remained 235–240 months. (*Id.* at 2550). Roe argued for a large downward variance from this range for two reasons. First, he argued that his criminal history category VI was overstated because his convictions represented crimes commonly committed by drug addicts. (R. 319: Sent. Tr., 2637–38). But more importantly, he argued that Dr. Buzzard should receive a higher sentence as the doctor overprescribing opioids. (*Id.* at 2634–38). Thus, Roe asked for a sentence between the 72-month sentence that Dr. Buzzard received and the 60-month sentence that one of Roe's subordinate drug distributors in Tennessee, Donald Cox, received. (*Id.* at 2638–45).

This Court did not follow Roe's suggestion. It noted the number of pills distributed by the conspiracy was "terrifying" and that Roe had not taken advantage of prior opportunities to change his ways, but "return[ed] to custody, return[ed] to custody, return[ed] to custody" instead. (*Id.* at 2647, 2652–53). Because of his many parole violations, this Court rejected Roe's claim that his criminal history was overstated and instead found that he needed to be imprisoned to protect the public from further crimes if nothing else. (*Id.* at 2655–56). Still, this Court

varied downward significantly because of Roe's drug addiction and his potential to do "good deeds in the world and to help others" and sentenced him to 144 months in prison. (*Id.* at 2657–59; R. 315: Judgment, 2506).

Roe began serving his prison sentence on September 27, 2018, and is currently incarcerated at Elkton Correctional Facility. He is 52 years old, and his projected release date is November 30, 2025. His only underlying medical condition is a single episode of kidney stones in the fall of 2019, which apparently remains under control with the treatments he received. (See Exhibit B – Roe's Medical Records 2019).

## Argument

### I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

#### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In

9

areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures

will help federal inmates remain protected from Covid-19 and ensure

that they receive any required medical care during these difficult times.

### B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing

the placement of federal prisoners in home confinement. New

legislation now temporarily permits the Bureau of Prisons to "lengthen

the maximum amount of time for which [it] is authorized to place a

prisoner in home confinement" during the Covid-19 pandemic.

Coronavirus Aid, Relief, and Economic Security Act (CARES Act)

§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).

The Attorney General has also issued two directives, ordering the

Bureau of Prisons to use the "various statutory authorities to grant

home confinement for inmates seeking transfer in connection with the

ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of

Prisons to identify the inmates most at risk from Covid-19 and "to

consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020

Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,400 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

      1.) Each inmate's age and vulnerability to Covid-19;

      2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

      3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C.

12

§ 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken

advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates

who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18-20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## C.     The Court should decline Roe's request for a recommendation that he be granted home confinement.

The Court should also deny Roe's request for a judicial recommendation to the Bureau of Prisons that he finish his sentence under home confinement. Even assuming the Court has the authority to grant such a recommendation, Roe is not a strong candidate for it. As the Court noted during his sentencing hearing, that Roe needed to be

15

imprisoned to protect the public from further crimes if nothing else. (*Id.* at 2655–56).

Roe's criminal history is fraught with numerous instances of engaging in criminal conduct while on parole and within months of his release from prison. Roe has demonstrated a blatant disregard for the law and has shown he is not willing to abide by the criminal justice system's attempts to immerse him into a law-abiding life by committing criminal offenses after numerous contacts with law enforcement officials, lengthy stays in the prison system, and while on supervision. Roe's record thus suggests that his release into home confinement would quickly spiral into additional criminal conduct.

## II.   The Court should deny Roe's motion for compassionate release.

Roe's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception,

16

a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is

mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

## A.    There are no extraordinary and compelling reasons to grant Roe's compassionate release.

Even if Roe had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the

18

Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United*

19

*States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala.

Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of

defendants who are most in need. That policy statement limits

"extraordinary and compelling reasons" to four categories: (1) the

inmate's medical condition; (2) the inmate's age; (3) the inmate's family

circumstances; and (4) other reasons "[a]s determined by the Director of

the Bureau of Prisons," which the Bureau of Prisons has set forth in

Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth

Circuit recently explained, a district court "lack[s] jurisdiction" to grant

compassionate release when a defendant's circumstances do not fall

within those categories. *Saldana*, 2020 WL 1486892, at *3.

Roe relies on his age and medical condition, but he is not eligible for

compassionate release on either basis. Roe is 52 years old and he is in

good physical health with no serious medical conditions.

Nor is Roe correct in suggesting that the Covid-19 pandemic should

alter this analysis here. Even assuming, in other cases, that a

defendant's risk from Covid-19 might make the difference in his

eligibility for release under § 1B1.13, Roe's circumstances do not satisfy

20

that standard. Despite his argument to the contrary, he does not have any underlying medical conditions that would place him at a higher risk for sever illness as determined by the Centers for Disease Control (CDC). The medical records obtained from the correctional facility demonstrate Roe does not suffer from high blood pressure, coronary disease, or diabetes. In fact, on April 30, 2020, Roe was seen by the medical staff at Elkton due to a chronic cough with no other symptoms. The medical staff, out of an abundance of caution, ordered a chest X-Ray, which was normal. (See Exhibit C - Roe's Medical Records 2020).

As Roe's prior conduct shows, he would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has

worked diligently to implement precautionary measures reducing the risk from Covid-19 to Roe and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Roe is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." Roe is clearly a danger to the community. He has an extensive criminal history and has proven that he cannot adhere to any court order to refrain from engaging in new criminal conduct. Roe is not eligible for compassionate release.

## B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. So even if the

Court were to find Roe eligible for compassionate release, the § 3553(a) factors should still disqualify him.

In determining if compassionate release is appropriate the Court is also to consider a number of other factors, including (i) the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a).

The details of the offense involve a significant amount of opioid pills. The sheer volume of narcotics alone, placed on the streets of Tennessee and Michigan, was staggering. As this Court noted during Roe's sentencing, the number of pills distributed by the conspiracy was "terrifying" and that Roe had not taken advantage of prior opportunities to change his ways. (*Id.* at 2647, 2652–53).

Roe also involved his child in his DTO. As the Court is aware, Nichols Malinowski has an extensive drug addiction problem that was likely fueled by acting as an opioid courier for his father. Instead of assisting his child to overcome his drug addiction, Roe involved him a multi-state opioid drug distribution ring.

Roe also preyed on those most vulnerable to act as patients in his drug ring. He utilized individuals, who were addicted to opioids or illicit

substances or were beholden to him in some way. He endangered the lives of the citizens of Michigan, Tennessee and those who engaged in this conspiracy with him.

Roe has demonstrated that he has not been rehabilitated by his prior terms of incarceration, and if released from custody he will likely return to a life of crime.

## [III.  If the Court were to grant Roe's motion, it should stay the release order pending any appeal by the United States.]

[If the Court were inclined to grant Roe's motion, despite the government's arguments above, the government would request that the Court's release order include two provisions. First, the Court should order that he be subjected to a 14-day quarantine before release. Second, the Court should stay its order pending any appeal by the government to the Sixth Circuit. More specifically, the government would request that if the government files a notice of appeal before the 14-day quarantine ends, the Court's order would automatically be stayed through the completion of any appeal proceedings.

24

## Conclusion

Roe's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/REGINA R. MCCULLOUGH
Assistant United States Attorney
Chief, Health Care Fraud Unit
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9618
Email: regina.mccullough@usdoj.gov

Dated: May 14, 2020

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 14th, day of May, 2020, I caused a copy

of the foregoing to be served on all counsel of record using the Court's

ECF filing system.

s/REGINA R. MCCULLOUGH
Assistant United States Attorney
Chief, Health Care Fraud Unit
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9618
Email: regina.mccullough@usdoj.gov
Bar No.: P64936
